**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDY ANSRYAN, on behalf of himself and all others similarly situated, | CLASS ACTION COMPLAINT |
| Plaintiff, | JURY TRIAL DEMANDED |
| vs. | **Case No.** |
| CHRISTIAN DIOR, INC. and CHRISTIAN DIOR COUTURE SAS, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Andy Ansryan, ("Mr. Ansryan" or "Plaintiff"), on behalf of himself and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Christian Dior, Inc. and Christian Dior Couture SAS ("Defendants" or "Christian Dior").  Facts pertaining to Plaintiff and their personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon information and belief, as well as, inter alia, the investigation of Plaintiffs' counsel.

## NATURE OF THE CASE

1.    This is a class action for damages against Christian Dior for its failure to exercise reasonable care in securing and safeguarding customers' sensitive personal data.

2.    This class action is brought on behalf of individuals whose sensitive PII was stolen by cybercriminals in a cyber-attack on Christian Dior's systems that took place on or around January 26, 2025 and which resulted in the access and exfiltration of sensitive client

information (the "Data Breach"). The stolen data included names, addresses, contact information, dates of birth, and Social Security, government ID, and passport numbers in some cases.

3.      Defendants did not began notifying affected individuals until on or around July 18, 2025.

4.      As a result of the Data Breach and Defendants' failure to promptly notify Plaintiff and Class members of the Data Breach, Plaintiff and Class members have experienced and will experience various types of misuse of their PII in the coming months and years, including but not limited to, unauthorized credit card charges, unauthorized access to email accounts, identity theft, and other fraudulent use of their Private Information.

5.      There has been no assurance offered from Christian Dior that all personal data or copies of data have been recovered or destroyed.

6.      Accordingly, Plaintiff assert claims for negligence, breach of third-party beneficiary contract, breach of implied contract, breach of fiduciary duty, and declaratory and injunctive relief.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

8.      The Court has personal jurisdiction because Defendants' principal place of business is located in this District.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants maintains its principal place of business in this District and therefore resides in this District

pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## PARTIES

**A.     Plaintiff Andy Ansryan**

11.     Plaintiff Andy Ansryan is a resident and citizen of Los Angeles, California and brings this action in his individual capacity and on behalf of all others similarly situated. Mr. Ansryan purchased goods from Defendants in November of 2023. As a condition of purchase, Mr. Ansryan was required to disclose his Private Information, which was then entered into Christian Dior's database and maintained without his knowledge. In maintaining his Private Information, Defendants expressly and impliedly promised to safeguard Mr. Ansryan's Private Information.  Defendant, however, did not take proper care of Mr. Ansryan's Private Information, leading to its exposure to, and exfiltration by cybercriminals as a direct result of Defendants' inadequate security measures.

12.     On or around July 19, 2025, Mr. Ansryan received a notification letter from Defendants stating that his Private Information was compromised by cybercriminals.

13.     Mr. Ansryan and Class members have faced and will continue to face a certainly impending and substantial risk of future harms as a result of Defendants' ineffective data security measures, as further set forth herein.  Some of these harms will include fraudulent charges,

medical procedures ordered in clients' names without their permission, and targeted advertising without client consent.

14.    Some of these harms will not materialize for years after the Data Breach, rendering Defendants' notice letter woefully inadequate to prevent the fraud that will continue to occur through the misuse of Class members' information.

15.    Mr. Ansryan greatly values his privacy, especially while purchasing luxury goods, and would not have purchased such goods had he known that Christian Dior would negligently maintain his Private Information as it did.

**B.    Defendant**

16.    Defendants Christian Dior, Inc. and Christian Dior Couture SAS, is a New York-based company that sells luxury fashion goods. Christian Dior's headquarters are located at 712 5th Avenue, New York, New York 10019 and Christian Dior is incorporated in New York. Christian Dior's corporate policies and practices, including those used for data privacy, are established in, and emanate from the state of New York.

## **FACTS**

17.    On or about May 7, 2025, Defendants discovered unauthorized activity on its network, which contained clients' Private Information.

18.    Upon learning of the Data Breach, Defendants investigated and later began sending notification of the incident to affected parties. On or around July 18, 2025, Defendants sent form notification letters to Plaintiff and other affected parties.  The form letter included generic information and recommended time consuming steps for individuals to take.

19.     Defendants offered no explanation for the delay between the initial discovery of the Breach and the belated notification to affected clients, which resulted in Plaintiff and Class members suffering harm they otherwise could have avoided had a timely disclosure been made.

20.     Defendants' notice of the Data Breach was not just untimely but woefully deficient. It failed to provide basic details, including, but not limited to: how unauthorized parties accessed its networks, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the Breach occurred system-wide, whether servers storing information were accessed, and how many customers were affected by the Data Breach.

21.     Nor does the notice provide a clear explanation of the risk Plaintiff and Class members face as a result of the loss of their Private Information, and it only "recommends" that Class members take advantage of free, publicly available resources to monitor their accounts.

22.     Moreover, Christian Dior's offer to provide 24 months of credit monitoring is woefully inadequate. Credit monitoring only alerts individuals to the misuse of their information after it happens, which might not take place until years after the Data Breach.

23.     In light of the types of personal information at issue, and the fact that the Private Information was specifically targeted by cybercriminals with the intent to steal and misuse it, it can be determined that Plaintiffs' and Class members' PII is being sold on the dark web, meaning that unauthorized parties have accessed, viewed, and exfiltrated Plaintiffs' and Class members' unencrypted, unredacted, sensitive personal information, including names and Social Security Numbers.

24.     The Breach occurred because Defendants failed to take reasonable measures to protect the PII it collected and stored. Among other things, Defendants failed to implement data security measures designed to prevent this attack, despite repeated warnings to high-profile

consumer brands and associated entities about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past on other organizations.

25.    Defendants disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class members was compromised through unauthorized access by an unknown third party. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe.

## A.    Defendants Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Client Private Information

26.    Christian Dior acquires, collects, and stores a massive amount of its clients' protected PII.

27.    As a part of its regular business activities, Christian Dior requires customers entrust it with their clients' highly confidential Private Information.

28.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' Private Information, Christian Dior assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class members' Private Information from disclosure.

29.    Defendants had obligations created by the Health Insurance Portability and Accountability Act (42 U.S.C. § 1320d et seq.) ("HIPAA"), data breach reporting requirements, industry standards, common law, and representations made to Class members, to keep Class

members' Private Information confidential and to protect it from unauthorized access and disclosure.

30.    As evidenced by Defendants' failure to comply with the legal obligations established by HIPAA and state law, Defendants failed to properly safeguard Class members' Private Information, allowing hackers to access their Private Information.

31.    Plaintiff and Class members provided their Private Information to the various firms Christian Dior works with the reasonable expectation and mutual understanding that Defendants and any of its affiliates would comply with their obligation to keep such information confidential and secure from unauthorized access.

32.    Prior to and during the Data Breach, Defendants promised its customers that their clients' Private Information would be kept confidential.

33.    Defendants' failure to provide adequate security measures to safeguard clients' Private Information is especially egregious because Defendants operates in industries which have recently been a frequent target of scammers attempting to fraudulently gain access to customers' highly confidential Private Information.

34.    In fact, Defendants has been on notice for years that the luxury fashion industry is a prime target for scammers because of the amount of confidential client information maintained.

35.    The number of US data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[1]  In 2017, a new record high of 1,579 breaches were reported—representing a 44.7 percent increase.[2]  That trend continues.

---

[1]  Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/surveys-studys.
[2] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/.

36.     A 2017 study conducted by HIMSS Analytics showed that email was the most likely cause of a data breach, with 78 percent of providers stating that they experienced a healthcare ransomware or malware attack in the past 12 months.

37.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[3]

38.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[3] *See How to Protect Your Networks from RANSOMWARE*, FBI (2016) https ://www. fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Manage the use of privileged accounts based on the principle of least privilege; no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

39.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest

patches. Vulnerable applications and OSs are the target of most ransomware attacks . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself.  Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . .[4]

---

[4] *See Security Tip (ST19-001) Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001.

40.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply the latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privilege credentials;

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[5]

---

[5] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT (Mar. 5, 2020).

41.    These are basic, common-sense security measures that every business should be doing. By adequately taking these common-sense measures, Christian Dior could have prevented this Data Breach from occurring.

42.    Charged with handling sensitive PII, Christian Dior knew, or should have known, the importance of safeguarding its customers' clients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on the clients in Christian Dior's database as a result of a breach. Christian Dior failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

43.    With respect to training, Christian Dior specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

44.    The PII was also maintained on Christian Dior's computer system in a condition vulnerable to cyberattacks such as through the infiltration of Defendants' systems through ransomware attacks.  The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class members' PII was a known risk to Defendant, and thus Christian Dior was on notice that failing to take reasonable steps necessary to secure the PII from those risks left the PII in a vulnerable position.

_____

https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-apreventable-disaster/.

**B. The Monetary Value of Privacy Protections and Private Information**

45.     The fact that Plaintiffs' and Class members' Private Information was stolen means that Class members' information is likely for sale by cybercriminals and will be misused in additional instances in the future.

46.     At all relevant times, Defendants was well aware that Private Information it collects from Plaintiff and Class members is highly sensitive and of significant value to those who would use it for wrongful purposes.

47.     Private Information is a valuable commodity to identity thieves.  As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[6]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII including sensitive health information on multiple underground Internet websites, commonly referred to as the dark web.

48.      At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[7]

---

[6] Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.
[7] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

49.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[8]

50.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[9]

51.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[10] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

52.     Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[11]

---

[8] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703 5290 [hereinafter *Web's New Hot Commodity*].

[9] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_ statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[10] *Web's Hot New Commodity*, *supra* note 8.

[11] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

53.    The value of Plaintiffs' and Class members' Private Information on the black market is substantial.

54.    The ramifications of Christian Dior's failure to keep its clients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for 6 to 12 months or even longer.

55.    Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[12] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[13]

56.    At all relevant times, Defendants was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.  Defendants should have particularly been aware of these risks, given the significant number of data breaches affecting luxury goods purveyors and related industries.

57.    Had Defendants remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would have prevented the ransomware attack into its systems and, ultimately, the theft of the Private Information of clients within its systems.

---

[12] *See Medical ID Theft Checklist*, IDENTITYFORCE, https://www.identityforce.com/blog/medical-id-theft-checklist-2.
[13] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

58.     The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[14] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[15] Based upon information and belief, the unauthorized parties have already utilized, and will continue utilize, the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class members that can be misused.

59.     In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

60.     Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

---

[14] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.
[15] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

61.    Given these facts, any company that transacts business with customers and then compromises the privacy of customers' Private Information has thus deprived customers of the full monetary value of their transaction with the company.

62.    Acknowledging the damage to Plaintiff and Class members, Defendants instructed affected clients like Plaintiff to remain vigilant and take steps to protect their identity, credit, and personal information. Plaintiff and the other Class members now face a greater risk of identity theft.

63.    In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

**A.    Christian Dior Failed to Comply with FTC Guidelines**

64.    Christian Dior was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

65.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

---

[16] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

66.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[17] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

67.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[18]

68.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69.    Christian Dior was at all times fully aware of its obligation to protect the Private Information of the clients in its database because of its position as a high-profile luxury goods provider. Christian Dior was also aware of the significant repercussions that would result from its failure to do so.

---

[17] *Protecting Personal Information: A Guide for Business*, FED. TRADE. COMM'M (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.
[18] *Start with Security*, *supra* note 32.

70.    As evidenced by Defendants' failure to comply with its legal obligations established by the FTC Act, Defendants failed to properly safeguard Class members' Private Information, allowing hackers to access their Private Information

**C.  Damages to Plaintiff and the Class**

71.    Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

72.    The ramifications of Christian Dior's failure to keep clients' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to the victims may continue for years.  Consumer victims of data breaches are more likely to become victims of identity fraud.[19]

73.    In addition to its obligations under state and federal laws and regulations, Defendants owed a common law duty to Plaintiff and Class members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

74.    Defendants further owed and breached its duty to Plaintiff and Class members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

75.    As a direct result of Defendants' intentional, willful, reckless, and negligent conduct that resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff and Class members'

---

[19] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering, identity theft and fraud.

76.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

77.    Some of the injuries and risks associated with the loss of personal information have already manifested themselves in Plaintiffs' and Class members' lives. Plaintiff received a cryptically written notice letter from Defendants stating that their information may have been released, and that they should remain vigilant for fraudulent activity on their accounts, with no other explanation of where this information could have gone, or who might have access to it.

78.    Moreover, Plaintiff and the Class have suffered and continue to face a substantial risk of suffering further out-of-pocket fraud losses such as additional fraudulent charges on online accounts, credit card fraud, applications for benefits made fraudulent in their names, loans opened in their names, medical services billed in their names, and identity theft.

79.    Plaintiff and Class members have, may have, and/or will have incurred out of pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

80.    Plaintiff and Class members did not receive the full benefit of their bargain when paying for professional and medical services. Instead, they received goods of a diminished value compared to what they thought they were receiving. Plaintiff and Class members were damaged

in an amount at least equal to the difference in the value between the goods they thought they paid for (which would have included adequate data security protection) and the goods they actually received.

81.     Plaintiff and Class members would not have purchased goods from Defendants had they known that Defendants failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

82.     Plaintiff and the Class will continue to spend significant amounts of time to monitor their financial and medical accounts for misuse.

83.     The theft of Social Security Numbers is particularly detrimental to victims.  The U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest growing crimes in America."[20]  The SSA has stated that "[i]dentity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought."[21]  In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[22]

84.     In fact, a new Social Security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems.  If the old credit information is not associated with your new number, the absence of any credit history under your new number may

---

[20] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMIN. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.

[21] *Id.*
[22] *Id.*

make it more difficult for you to get credit."[23]

85.    Identity thieves can use a victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest. For Plaintiff and Class members, this risk creates unending feelings of fear and annoyance. Private information is especially valuable to identity thieves. Defendants knew or should have known this and strengthened its data systems accordingly. Defendants was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

86.    As a result of the Data Breach, Plaintiff and Class members' Private Information has diminished in value.

87.    The Private Information belonging to Plaintiff and Class members is, as its name suggests, private, and was inadequately protected by Defendant.  Defendants did not obtain Plaintiffs' or Class members' consent to disclose such Private Information to any other person as required by applicable law and industry standards. Instead, Defendants disclosed information about Plaintiff and the Class that was of an extremely personal and sensitive nature as a direct result of its inadequate security measures.

88.    The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiffs' and Class members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class

---

[23] *Id.*

members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

89.     Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect customer data.

90.     Defendants did not properly train its employees, particularly its information technology department, to timely identify and/or avoid ransomware attacks.

91.     Had Defendants remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiffs' and Class members' Private Information.

92.     As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

93.     The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[24]

94.     Defendants has not taken any measures to assist Plaintiff and Class members other than advising them to do the following:

    •    remain vigilant for incidents of fraud and identity theft;

---

[24] See U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

- review account statements and monitor credit reports for unauthorized activity;
- obtain a copy of free credit reports;
- contact the FTC and/or the state Attorney General's office;
- enact a security freeze on credit files; and
- create a fraud alert.

None of these recommendations, however, require Defendants to expend any effort to protect Plaintiffs' and Class members' Private Information.

95.    Defendants' failure to adequately protect Plaintiffs' and Class members' Private Information has resulted in Plaintiff and Class members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Defendants sits by and does nothing to assist those affected by the incident. Instead, as Christian Dior's Data Breach Notice indicates, it is putting the burden on Plaintiff and Class members to discover possible fraudulent activity and identity theft.

96.    Thus, to mitigate harm, Plaintiff and Class members are now burdened with indefinite monitoring and vigilance of their accounts to an extent that exceeds the monitoring and vigilance of their accounts previously required before the Data Breach.

97.    Plaintiff and Class members have been damaged in several other ways as well. Plaintiff and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming task. Plaintiff and Class members have also been forced to purchase adequate credit reports, credit monitoring and other identity protection services, and have placed credit freezes and fraud alerts on their credit reports, while also spending significant time investigating and disputing fraudulent or suspicious activity on their

accounts. Plaintiff and Class members also suffered a loss of the inherent value of their Private Information.

98.     The Private Information stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

99.     As a result of Defendants' failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;

- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

- The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake appropriate measures to protect the Private Information in its possession;

- Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and

repair the impact of the Data Breach for the remainder of the
lives of Plaintiff and Class members; and

- Anxiety and distress resulting fear of misuse of their Private
  Information.

100.    In addition to a remedy for the economic harm, Plaintiff and Class members

maintain an undeniable interest in ensuring that their Private Information remains secure and is

not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff incorporate by reference all other paragraphs of this Complaint as if fully

set forth herein.

102.    Plaintiff bring this action individually and on behalf of all other persons similarly

situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or

23(c)(4).

103.    Specifically, Plaintiff propose the following Nationwide Class, (the "Class")

definitions:

### Nationwide Class

All persons residing in the United States whose Private Information
was compromised as a result of the Data Breach discovered on or
about May 7 of 2025 and who were sent notice of the Data Breach.
Excluded from the Class are Defendants and Defendants' affiliates, parents, subsidiaries,

employees, officers, agents, and directors.  Also excluded are any judicial officers presiding over

this matter and the members of their immediate families and judicial staff.

104.    Plaintiff reserve the right to modify, change, amend, or expand the definitions of

the Nationwide Class, based upon discovery and further investigation.

105.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

106.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all Class members would be impracticable.  On information and belief, the Nationwide Class number in the hundreds of thousands.

107.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class.  Such common questions of law or fact include, *inter alia*:

  a.    Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

  b.    Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

  c.    Whether Defendants properly implemented its purported security measures to protect Plaintiffs' and the Class's Private Information from unauthorized capture, dissemination, and misuse;

  d.    Whether Defendants took reasonable measures to determine the extent of the Data Breach after it first learned of same;

  e.    Whether Defendants disclosed Plaintiffs' and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

  f.    Whether Defendants willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and the Class's Private Information;

  g.    Whether Defendants was negligent in failing to properly secure and protect Plaintiffs' and the Class's Private Information;

  h.    Whether Defendants was unjustly enriched by its actions; and

  i.    Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

108.     **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through Defendants' uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

109.     **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff are adequate representatives of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and they will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and their counsel.

110.     **Injunctive Relief-Federal Rule of Civil Procedure 23(b)(2).** Defendants has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

111.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.  Even if members of the Class could afford individual

litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class)**

112.    Plaintiff fully incorporates by reference all of the above paragraphs, as though they are fully set forth herein.

113.    Upon Defendants accepting and storing the Private Information of Plaintiff and the Class in its computer systems and on its networks, Defendants undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendants knew that the Private Information was private and confidential and should be protected.

114.    Defendants owed a duty of care not to subject Plaintiffs' and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

115.    Defendants owed numerous duties to Plaintiff and the Class, including the following:

   a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

   b.  To protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

    c.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

116.    Defendants also breached its duty to Plaintiff and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information.  Furthering its dilatory practices, Defendants failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff and Class members' Private Information and misuse the Private Information and intentionally disclose it to others without consent.

117.    Defendants knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security.  Defendants knew or should have known about numerous well-publicized data breaches within the manufacturing industry.

118.    Defendants knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff and Class members' Private Information.

119.    Defendants breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

120.    Because Defendants knew that a breach of its systems would damage thousands of its customers' clients, including Plaintiff and Class members, Defendants had a duty to adequately protect its data systems and the Private Information contained thereon.

121.    Defendants' duty of care to use reasonable security measures arose because of the special relationship that existed between Defendants and its employees, which is recognized by statute, regulations, and the common law.  Defendants was in a position to ensure that its systems

were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

122.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

123.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information.  Defendants' misconduct included failing to: (1) secure Plaintiffs' and Class members' Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

124.    Defendants breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information, and by failing to provide timely notice of the Data Breach.  The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

b.  Failing to adequately monitor the security of Defendants' networks and systems;

c.  Allowing unauthorized access to Class members' Private Information; and

d.  Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

125.    Through Defendants' acts and omissions described in this Complaint, including its failure to provide adequate security and its failure to protect Plaintiffs' and Class members'

Private Information from being foreseeably captured, accessed, disseminated, stolen and

misused, Defendants unlawfully breached its duty to use reasonable care to adequately protect

and secure Plaintiffs' and Class members' Private Information during the time it was within

Defendants' possession or control.

126.    Defendants' conduct was grossly negligent and departed from all reasonable

standards of care, including, but not limited to failing to adequately protect the Private

Information and failing to provide Plaintiff and Class members with timely notice that their

sensitive Private Information had been compromised.

127.    Neither Plaintiff nor the other Class members contributed to the Data Breach and

subsequent misuse of their Private Information as described in this Complaint.

128.    As a direct and proximate cause of Defendants' conduct, Plaintiff and Class

members suffered damages as alleged above.

129.    Plaintiff and Class members are also entitled to injunctive relief requiring

Defendants to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii)

submit to future annual audits of those systems and monitoring procedures; and (iii) immediately

provide lifetime free credit monitoring to all Class members.

<u>COUNT II</u>
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

130.    Plaintiff fully incorporates by reference all of the above paragraphs, as though

fully set forth herein.

131.    Through its course of conduct, Christian Dior, Plaintiff, and Class members

entered into contracts for the provision of various goods, as well as implied contracts for the

Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class members' Private Information.

132.    Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendants when he first purchased goods from Defendant.

133.    When Plaintiff and Class members provided their Private Information to Defendants and entities contracting with Defendants in exchange for Defendants' goods, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

134.    Defendants solicited and invited Class members to provide their Private Information as part of Defendants' regular business practices. Plaintiff and Class members accepted Defendants' offers and provided their Private Information to Defendant.

135.    In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

136.    Plaintiff and Class members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to obtain adequate data security. Part of the of price that they paid was intended to be used to fund adequate data security. Defendants failed to do so.

137.    Under implied contracts, Defendants and/or its affiliated providers promised and were obligated to: (a) provide luxury goods to Plaintiff and Class members; and (b) protect Plaintiff and Class members' Private Information provided to obtain the benefits of such services. In exchange, Plaintiff and Class members agreed to pay money for these goods, and to turn over their Private Information.

138.    Both the provision of goods and the protection of Plaintiff and Class members' Private Information were material aspects of these implied contracts.

139.    The implied contracts for the provision of goods that includes the contractual obligations to maintain the privacy of Plaintiffs' and Class members' Private Information are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendants' Data Breach notification letter and Defendants' relevant privacy policy documents.

140.    Defendants' express representations, including, but not limited to the express representations found in its privacy policy, memorializes and embodies the implied contractual obligation requiring Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class members' Private Information.

141.    Consumers of luxury goods value their privacy, the privacy of their dependents, and the ability to keep confidential their Private Information associated with obtaining such services.  Plaintiff and Class members would not have entrusted their Private Information to Defendants and entered into these implied contracts with Defendants without an understanding that their Private Information would be safeguarded and protected, nor would they have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

142.    A meeting of the minds occurred, as Plaintiff and Class members agreed and provided their Private Information to Defendants and/or its affiliated companies and provided payment in exchange for, among other things, the protection of their Private Information.

143.    Plaintiff and Class members performed their obligations under the contract when they paid for Defendants' goods and provided their Private Information.

144.    Defendants materially breached its contractual obligation to protect the nonpublic Private Information Defendants gathered when the information was accessed and exfiltrated by the Data Breach.

145.    Defendants materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant privacy policy. Defendants did not maintain the privacy of Plaintiff and Class members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and Class members. Specifically, Defendants did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiffs' and Class members' private information as set forth above.

146.    The Data Breach was a reasonably foreseeable consequence of Defendants' actions in breach of these contracts.

147.    As a result of Defendants' failure to fulfill the data security protections promised in these contracts, Plaintiff and Class members did not receive full benefit of the bargain, and instead goods that were of a diminished value to that described in the contracts. Plaintiff and Class members, therefore, were damaged in an amount at least equal to the difference in the value between the goods with data security protection they paid for and the goods they received.

148.    Had Defendants disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither Plaintiffs, Class members, nor any reasonable person would have purchased goods from Defendants' affiliated providers, from which services Defendants directly benefits.

149.    As a direct and proximate result of the Data Breach, Plaintiff and Class members will suffer actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of

suffering additional damages in the future, disruption of their medical care and treatment, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

150.    Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

151.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Nationwide Class)

152.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

153.    In providing their Private Information to Defendant, Plaintiff and Class members justifiably placed a special confidence in Defendants to act in good faith and with due regard for the interests of Plaintiff and Class members to safeguard and keep confidential that Private Information.

154.    Defendants accepted the special confidence Plaintiff and Class members placed in it, as evidenced by its assertion that it is committed to protecting the privacy of Plaintiffs' personal information as included in the Data Breach notification letter.

155.    In light of the special relationship between Defendant, Plaintiffs, and Class members, whereby Defendants became a guardian of Plaintiff and Class members' Private Information, Defendants became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its customers, including Plaintiff and Class members for the safeguarding of Plaintiff and Class members' Private Information.

156.    Defendants has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of its customer relationships, in particular, to keep secure the Private Information of its customers.

157.    Defendants breached its fiduciary duties to Plaintiff and Class members by failing to protect the integrity of the systems containing Plaintiffs' and Class members' Private Information.

158.    Defendants breached its fiduciary duties to Plaintiff and Class members by otherwise failing to safeguard Plaintiff and Class members' Private Information.

159.    As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including but not limited to:

    a.  Actual identity theft;

    b.  The compromise, publication, and/or theft of their Private Information;

    c.  Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

    d.  Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

    e.  The continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

f.   Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

g.   The diminished value of the services they paid for and received.

160.    As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiff and Class members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT IV

## UNJUST ENRICHMENT/ QUASI CONTRACT

### (On Behalf of Plaintiff and the Nationwide Class)

161.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

162.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendants with their Private Information. In exchange, Plaintiff and Class members should have received from Defendants data storage that was compliant with and maintained in accordance with Defendants' pre-existing duties to secure such information under federal law and industry standards and were entitled to have Defendants protect their Private Information with adequate security.

163.    Defendants knew that Plaintiff and Class members conferred a benefit on them and accepted or retained that benefit. Defendants profited from Plaintiffs' and Class Members' Private Information for business purposes.

164.    Defendants failed to secure Plaintiffs' and Class Members' Private Information and therefore, did not provide full compensation for the benefit the Plaintiffs' and Class

members' Private Information provided.

165.    Defendants acquired the Private Information through inequitable means as they

failed to disclose the inadequate security practices previously alleged.

166.    If Plaintiff and Class Members had known that Defendants would not secure their

Private Information using adequate security, they would not have provided their information to

Defendants' customers.

167.    Plaintiff and Class Members have no adequate remedy at law.

168.    Under the circumstances, it would be unjust for Defendants to be permitted to

retain any of the benefits that Plaintiff and Class members conferred on them.

169.    Defendants should be compelled to disgorge into a common fund or constructive

trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from

them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and

the Class members overpaid for the use of Defendants' services.

**<u>COUNT VI</u>**
**DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Nationwide Class)**

170.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully

set forth herein.

171.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is

authorized to enter a judgment declaring the rights and legal relations of the parties and granting

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here,

that are tortious and violate the terms of the federal statutes described in this Complaint.

172.    An actual controversy has arisen in the wake of the Data Breach regarding

Defendants' present and prospective common law and other duties to reasonably safeguard

Plaintiffs' and Class members' PII, and whether Defendants is currently maintaining data security

measures adequate to protect Plaintiff and Class members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their PII will occur in the future.

173.    The Court should also issue prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

174.    Defendants still possesses the PII of Plaintiff and the Class.

175.    To Plaintiffs' knowledge, Defendants has made no announcement that it has changed its data storage or security practices relating to the PII.

176.    To Plaintiffs' knowledge, Defendants has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

177.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Christian Dior. The risk of another such breach is real, immediate, and substantial.

178.    The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs at Christian Dior, Plaintiff and Class members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants has a pre-existing legal obligation to employ such measures.

179.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at

Christian Dior, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other consumers whose PII would be further compromised.

180.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Christian Dior implement and maintain reasonable security measures, including but not limited to the following:

h.  Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Christian Dior's systems on a periodic basis, and ordering Christian Dior to promptly correct any problems or issues detected by such third-party security auditors;

i.  Engaging third-party security auditors and internal personnel to run automated security monitoring;

j.  Auditing, testing, and training its security personnel regarding any new or modified procedures;

k.  Purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

l.  Conducting regular database scans and security checks; and

m.  Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully demand a jury trial of all issues so triable and requests

that the Court enter judgment in their favor and against Defendant, as follows:

a.  Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representatives, and appointing Class Counsel as requested in Plaintiffs' expected motion for class certification;

b.  Ordering Defendants to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

c.  Ordering injunctive relief requiring Defendants to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring to all Class members indefinitely;

d.  Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and their counsel;

e.  Ordering Defendants to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

f.  Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

g.  Ordering such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury.

Date: August 14, 2025                              Respectfully submitted,

/s/ *Nicholas A. Migliaccio*
Nicholas A. Migliaccio (permanently admitted in S.D.N.Y., NY Bar # 4035838)
Jason Rathod (pro hac vice forthcoming)
MIGLIACCIO & RATHOD, LLP
412 H Street NE, Suite 302
Washington, D.C. 20002
Tel: (202) 470-3520
nmigliaccio@classlawdc.com